[Cite as *State v. Santos*, 2020-Ohio-1043.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28445 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-1840 |
| | : | |
| ERIC ALEXANDER SANTOS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of March, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Eric Alexander Santos, appeals from his conviction in the Montgomery County Court of Common Pleas after pleading no contest to tampering with evidence with a one-year firearm specification. In support of his appeal, Santos challenges the trial court's denial of his motion to suppress statements obtained by law enforcement officers in the course of a homicide investigation. He further challenges the trial court's denial of his motion to dismiss the firearm specification accompanying the tampering charge. Because the motions were not denied in error, the judgment of the trial court will be affirmed.

## I.     Facts and Course of Proceedings

{¶ 2} On the night of February 1, 2016, police were called to a residence on Curundu Avenue in Trotwood, Ohio. Two men seated in a vehicle in the driveway had been fatally shot. Lead investigator Patrick Craun, a 12-year veteran of the Trotwood Police Department, responded to the scene sometime after 10:00 p.m. Thereafter, a fellow officer informed Detective Craun that a civilian at the perimeter of the crime scene said he lived in the house. That man was 19-year-old Eric Santos.

{¶ 3} Detective Craun approached Santos and his girlfriend, Aiste Maksvytyte. He asked if Santos would come to the police station to answer a few questions to help the officers piece together what had happened. Santos agreed. He rode to the station in the front seat of Detective Craun's unmarked sedan, unrestrained. The detective did not question Santos while en route.

### The Trotwood Police Department Interview

{¶ 4} A short ride later, the two men arrived at the Trotwood Police Department and entered the building through a rear door. Detective Craun directed Santos to a

conference room. Santos remained unrestrained. The detective explained that he wished to ask some questions pertaining to a homicide investigation. Santos asked if his roommate was one of the victims, but the detective did not answer because the victims' next of kin had not yet been notified.

{¶ 5} According to Detective Craun, Santos seemed to understand why he was there. The detective asked basic questions concerning the inhabitants of the residence, when Santos was home last, the last time he spoke with anyone at the residence, how he heard about what had happened, and why he came to the scene. The interview lasted approximately 30 to 45 minutes.

{¶ 6} At the close of the interview, Detective Craun asked Santos to write out a witness statement. Santos complied. The detective left the room at one point, and he collected the completed statement when he returned. Santos remained in the conference room while the detective went to speak with other witnesses, including Aiste Maksvytyte.

{¶ 7} Unbeknownst to Detective Craun, there was an active warrant for Santos's arrest out of Greene County. A police department employee discovered the warrant while Detective Craun was interviewing Santos. Santos was taken into custody and, thereafter, transported to Greene County.

### The Greene County Jail Interview

{¶ 8} The next day, Detective Craun received word that Santos's girlfriend, Aiste, had returned to the Trotwood police station. She confessed that she had lied about events from the previous night. Aiste indicated that Santos was, in fact, present at the house when the homicides occurred. Based upon this information, Detective Craun and Captain Dan Heath traveled to the Greene County Jail to speak with Santos that evening. The

interview took place in a small room off of the common area in the jail. The room was not equipped for recording, but Detective Craun brought along a digital voice recorder to capture audio.

{¶ 9} Detective Craun reviewed Santos's constitutional rights prior to commencing questioning. He provided Santos with a standard form enumerating the rights in writing. The detective explained that he would read each of the rights out loud while Santos followed along on his own copy. Santos was to answer yes or no after each right was read to him lyand initial in the corresponding space next to each right. The detective further indicated there was a waiver of rights statement at the end of the form that Santos would be asked to read, and then he would sign and date the form.

{¶ 10} Detective Craun reviewed the rights section of the form with Santos at least twice. The process was not seamless. Nonetheless, at its conclusion, the detective was satisfied that Santos understood his rights. Santos did not ask any questions about waiving his rights. Instead, when asked if he wished to speak with the officers without counsel, he replied, "Yeah. Yeah. Yeah."   Despite this apparent eagerness, however, the detective did not believe Santos was being forthcoming in answering questions. After nearly 40 minutes, Santos indicated he was done talking. The officers continued to probe, eliciting further incriminating statements. Santos again indicated his wish to stop talking. The officers pressed further before finally concluding the interview.

**Criminal Prosecution in Montgomery County**

{¶ 11} In August 2018, Santos was charged with one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. The charge was accompanied by a one-year firearm specification under R.C. 2929.14 and 2941.141. By

way of a motion filed in November 2018, Santos sought to suppress the incriminating statements he made during the interview at the Trotwood Police station and during the interview at the Greene County Jail. Following a hearing, the trial court suppressed the statements made after Santos indicated his desire to halt the interview at the Greene County Jail, but denied the motion in all other respects.

{¶ 12} In February 2019, Santos moved to dismiss the firearm specification in the indictment. The trial court denied the motion. Thereafter, Santos entered a no contest plea to the tampering charge and firearm specification. He was sentenced to 36 months in prison, which was ordered to run concurrently to a term he was serving on an unrelated case out of Miami County. The one-year term on the firearm specification was ordered to run consecutively to this term.

{¶ 13} Santos now appeals, raising two assignments of error for our review.

## II.     Suppression of Statements

{¶ 14} In his first assignment of error, Santos argues that the trial court wrongly declined to suppress the incriminating statements he made to police while being interviewed at the Trotwood Police Department and at the Greene County Jail. We disagree.

### Standard of Review

{¶ 15} "In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' " *State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 7 (2d Dist.), quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "As a result, when we review suppression decisions, 'we are bound to accept

the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.' " *Id.*, quoting *Retherford*.

### Statements Made During Interview at Trotwood Police Department

{¶ 16} In the first issue raised under this assigned error, Santos maintains that any incriminating statements he made in response to Detective Craun's questions at the Trotwood Police Department on the night of February 1, 2016 should have been suppressed by the trial court because they were not preceded by *Miranda* warnings.

{¶ 17} "The right to [*Miranda*] warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination." *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 16 (2d Dist.), citing *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "It is well established, however, that the police are not required to administer [*Miranda*] warnings to every individual they question." *Id.*, citing *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). "Rather, only custodial interrogations trigger the need for [*Miranda*] warnings." *Id.*, citing *Biros* at 440. (Other citations omitted.)

{¶ 18} " 'Custodial interrogation' means questioning initiated by the police after the person has been taken into custody or otherwise deprived of his freedom to the degree associated with a formal arrest." (Citations omitted.) *State v. Vineyard*, 2d Dist. Montgomery No. 25854, 2014-Ohio-3846, ¶ 32; *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ("the ultimate inquiry is simply whether

there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest").

{¶ 19} Santos avers that he did not go to the Trotwood Police Department voluntarily. He emphasizes the wording in his written statement wherein he said Detective Craun "[told] him to take a ride to his precinct." Once at the station, Santos maintains, he was never free to leave. Instead, he was taken into custody pursuant to the active warrant out of Greene County. Because Detective Craun did not administer *Miranda* warnings prior to questioning him, Santos insists that his statements from this interview should have been suppressed.

{¶ 20} Despite these arguments, the record demonstrates that neither the interview at the Trotwood Police station nor the events leading up to this interview qualified as custodial interrogation so as to trigger the need for *Miranda* warnings. Santos was not considered a suspect when Detective Craun asked him to come to the police station for questioning. Rather, the detective sought to gather information to aid the investigation into the homicides. Despite Santos's word choice in his written statement, the detective steadfastly maintained on cross-examination that he asked Santos to accompany him to the station. Santos was free to say no, but came along willingly.

{¶ 21} None of the circumstances surrounding the drive to the Trotwood Police Department reflect any of the hallmarks of police custody. *See State v. Lux*, 2d Dist. Miami No. 2010 CA 30, 2012-Ohio-112, ¶ 30 (an individual given a voluntary "courtesy ride" from home to the police station was not in custody). The station was located about a mile or so from the crime scene. Santos sat in the front seat of Detective Craun's unmarked sedan. He was not handcuffed or physically restrained in any way. The vehicle was not a

police cruiser and, as such, had no cage. The doors locked, but nothing prevented Santos from unlocking and opening the passenger door as in any other vehicle. Nor was he told he could not leave. Finally, no other police officers accompanied the two men on the short drive.

{¶ 22} When the two men arrived at the Trotwood Police Department, Detective Craun brought Santos to the conference room rather than an interrogation room. This courtesy was extended because, again, Santos was a potential witness and not a suspect. The conference room had large windows on one wall and contained a sizeable table and chairs. The door locked from the inside, but nothing prevented an inhabitant from simply opening the door and walking out. Besides Detective Craun, no other officers were present in the conference room. Santos was not physically restrained, nor was he told he could not leave. The fact that the questioning took place at a police station did not counteract the decidedly non-custodial circumstances surrounding the interview. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.E.2d 714 (1977).

{¶ 23} In addition, Detective Craun denied making any promises or threats to convince Santos to answer his questions. The detective described the questioning as a "soft interview." Its sole purpose was to gather information. As such, the detective did not employ adversarial interrogation techniques or tactics. According to Detective Craun, Santos's demeanor remained even and cooperative during questioning.

{¶ 24} Detective Craun testified that Santos was still considered a witness when he collected the written statement from him. At no point did Santos ask to leave or indicate his wish to stop talking or to have an attorney present. Sometime after the interview was over, another officer removed Santos from the conference room and took him into custody

on the Greene County warrant. Santos was not questioned about the homicides for the remainder of his time at the Trotwood Police station.

{¶ 25} Viewed in their totality, the aforementioned circumstances compel the conclusion that Santos was neither in custody nor interrogated for the duration of his interview with Detective Craun at the Trotwood Police Department. Accordingly, the trial court did not err in refusing to suppress any incriminating statements made by Santos during this interview.

### Statements Made During Interview at Greene County Jail

{¶ 26} In the second issue raised under this assigned error, Santos argues that any incriminating statements made during his interview with Detective Craun and Captain Heath at the Greene County Jail on the night of February 2, 2016 should have been suppressed by the trial court. In support, he contends that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights prior to the commencement of the interview. The record speaks to the contrary.

{¶ 27} "In order for a waiver of the rights required by [*Miranda*] to be valid, the State bears the burden of demonstrating a knowing, intelligent, voluntary waiver based upon the totality of the facts and circumstances surrounding the interrogation." *State v. Dotson*, 2d Dist. Clark No. 97-CA-0071, 1997 WL 822694, *7 (Nov. 21, 1997), citing *Moran*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410. In considering the totality of the facts and circumstances, we look at "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on*

*other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 28} "What is essential is that the defendant have a full awareness of the nature of the constitutional rights being abandoned and the consequences of his decision to abandon them, and that the waiver not be the product of official coercion." *Dotson* at *7, citing *Moran*. " 'An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver * * *.' " *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 106, quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

{¶ 29} It is undisputed that Santos's interview at the Greene County Jail qualified as custodial interrogation. Santos emphasizes that fact that he was 19 years old at the time of the interview and that he had never before been read his *Miranda* rights. He repeatedly asked "what was going on" while Detective Craun recited the rights from the standard form. Santos maintains that the frustrated officers simply ushered him along. He further notes that Detective Craun neglected to ask about his educational background and failed to review the waiver portion of the form. Santos concludes that the totality of the circumstances surrounding the interview evince that he did not make a knowing, intelligent, and voluntary waiver of his *Miranda* rights, warranting suppression of his statements.

{¶ 30} Detective Craun used the standard Trotwood Police pre-interview form to review Santos's constitutional rights with him prior to questioning. The detective read the rights aloud while Santos followed along on his own copy. The rights were reviewed in this fashion at least twice. Detective Craun affirmed that Santos initialed next to each right on the form, and posed no questions to the officers about the substance of his rights.

Although the audio captured by Detective Craun's digital voice recorder is sometimes unclear, Detective Craun affirmed that Santos conveyed his understanding of each of his rights in turn. Thus, Santos acknowledged his rights both orally and in writing.

{¶ 31} During the reading of rights, Santos repeatedly said he did not understand what was going on. At the suppression hearing, defense counsel insisted the officers never directly addressed this statement. However, as Detective Craun testified, the officers were foreclosed from engaging Santos in discussion about the case until he was advised of his rights. The detective explained as much to Santos a number of times while reading the rights to him. Furthermore, viewing Santos's declaration in context, we believe it is clear that his expressed inability to understand went to why the officers had come to see him at the Greene County Jail. It did not concern his comprehension of his constitutional rights.

{¶ 32} Admittedly, Detective Craun's review of the pre-interview form was not flawless. He began reading the waiver section aloud, but was diverted and failed to complete it. He neglected to inquire into Santos's level of schooling, and he neglected to sign the form himself. These omissions are of no moment. The law does not require that interrogees be advised of their constitutional rights in writing, nor does it mandate a written waiver thereof. *State v. Evins*, 2d Dist. Montgomery No. 15827, 1997 WL 82803, *3 (Feb. 28, 1997); *State v. Scott*, 61 Ohio St.2d 155, 161, 400 N.E.2d 375 (1980). According to Detective Craun's testimony, he was satisfied that Santos understood the document he was signing. In addition, Detective Craun orally advised Santos that he could waive his right to remain silent. Thereafter, Santos indicated he was amenable to speaking with the detectives without an attorney present. This represented a clear waiver of his

constitutional rights.

{¶ 33} Further support can be found in the record. Santos could read and write, as evinced by the fact that he competed a written statement at the Trotwood Police station the previous night. He was a United States citizen from the Bronx in New York. Though Santos spoke Spanish, Detective Craun confirmed that he spoke English as well. The audio from the interview at the jail supports this assertion.

{¶ 34} With a table and three chairs inside, the makeshift interview room at the jail was tight. But this appeared to be the extent of the physical discomfort Santos endured during the interview. He was not handcuffed, or was he deprived of restroom breaks or refreshments. The record furthermore supports that Santos was coherent. He did not appear to be under the influence of any alcohol or drugs, and he did not claim to be taking any medications that could impair his understanding of his rights. There was no indication that he suffered from any mental or physical disabilities that would impair his understanding of his rights. Finally, at no point during the interview did Santos ask for an attorney.

{¶ 35} It is true that the officers went a few questions too far after Santos unequivocally invoked his right to remain silent. But the ill-gotten statements from the last few minutes of the interview were properly suppressed by the trial court. We conclude that the remainder of the record does not support Santos's assertion that he was prevented from knowingly, intelligently, and voluntarily waiving his *Miranda* rights. Accordingly, the trial court did not err in declining to suppress his statements from the jail interview in full.

{¶ 36} In view of our disposition of the above arguments, Santos's first assignment

of error is overruled.

### III.     Dismissal of Firearm Specification

{¶ 37} In his second assignment of error, Santos challenges the trial court's denial of his motion to dismiss the one-year firearm specification appended to the tampering with evidence charge. In the motion, Santos argued that the legislature evinced an intent to authorize the addition of mandatory prison time via specification only where a firearm was used to perpetrate or further the underlying offense. In the case sub judice, by contrast, the firearm was the object of the tampering offense. Santos concludes that the imposition of mandatory prison time under such circumstances effectively added punishment without his having been convicted of an additional charge. This assignment lacks merit.

### Standard of Review

{¶ 38} "A Crim.R. 12(C) motion to dismiss is a mechanism to test the legal sufficiency of the complaint or indictment. If the allegations set forth in the charging document constitute the criminal offense charged, the motion to dismiss must be overruled." *State v. Brown*, 2019-Ohio-1666, 135 N.E.3d 1151, ¶ 3 (2d Dist.), citing *State v. Patterson*, 63 Ohio App.3d 91, 95, 577 N.E.2d 1165 (2d Dist.1989). We review a trial court's decision on a motion to dismiss de novo, without deference to the trial court's decision. *Brown* at ¶ 3.

### Analysis

{¶ 39} It is well-settled under Ohio law that a charging instrument affords adequate notice to the accused if it tracks the language of the statute. *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 6-9. The indictment in the case at bar

alleged that:

> **ERIC ALEXANDER SANTOS**, *on or about* **FEBRUARY 1, 2016** *in the County of Montgomery aforesaid, and State of Ohio,* knowing that an official proceeding or investigation was in progress, or was about to be or likely to be instituted, did alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation; * * * in violation of Section 2929.12(A)(1) of the Ohio Revised Code[.]

Accompanying this charge was the following specification:

> The GRAND JURORS further find[ ] and specif[y] that while committing the aforesaid offense, **ERIC ALEXANDER SANTOS**, had on or about his person or under his control, a firearm * * * in violation of Sections 2929.14 and 2941.141 of the Ohio Revised Code[.]

**{¶ 40}** The respective charge and specification tracked the language of the relevant statutes precisely. Thus, the allegations in the indictment were sufficient to make out offenses under Ohio law. *See Buehner* at ¶ 6-9. In addition, the plain language of the subsection governing the one-year specification requires only that the offender had a firearm on or about his person or under his control. *See* R.C. 2929.14(B)(1)(a)(iii). Conspicuously absent from this subsection is verbiage requiring that the firearm be "used" to perpetrate or further the attached felony. *See id.* It would not be appropriate for us to read such verbiage into the statute. *State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, quoting *MedCorp, Inc. v. Dept. of Job and Family Servs.*, 121 Ohio St.3d 622, 2009-Ohio-2058, 906 N.E.2d 1125, ¶ 9 (where the plain language of a statute

is clear an unambiguous, courts must refrain from inserting or deleting words).

{¶ 41} Also of note, the legislature expressly excluded certain firearm offenses from enhancement via specification. *See* R.C. 2929.14(B)(1)(e). These include carrying concealed weapons (R.C. 2923.12), illegal conveyance of a deadly weapon or dangerous ordnance into a courthouse (R.C. 2923.123), improperly handling firearms in a motor vehicle (R.C. 2923.16), illegal possession of a firearm in a liquor permit premises (R.C. 2923.121), and having weapons while under disability (R.C. 2923.13).

{¶ 42} The relevant statute does not similarly exempt tampering with evidence from such enhancement. *See* R.C. 2929.14(B)(1)(e). Thus, in accordance with the maxim *expressio unius est exclusio alterius*, one must presume that the legislature did not intend to foreclose enhancement of a tampering with evidence charge. *See State v. Droste*, 83 Ohio St.3d 36, 39, 697 N.E.2d 620 (1998) (providing, "[u]nder the general rule of statutory construction *expressio unius est exclusio alterius,* the expression of one or more items of a class implies that those not identified are to be excluded").

{¶ 43} In accordance with the aforecited rationale, we decline to find that the imposition of prison time for both a tampering conviction and its attendant firearm specification contravenes the legislative intent behind the relevant statutes simply because the firearm was the object of the tampering charge. *State v. Jones*, 8th Dist. Cuyahoga No. 108050, 2019-Ohio-5237, ¶ 53-54; *State v. Wright*, 10th Dist. Franklin No. 09-AP-207, 2009-Ohio-6773, ¶ 32.

{¶ 44} Finally, although not fleshed out, Santos's appellate brief appears to advance the concepts of allied offenses and double jeopardy in challenging the denial of his motion to dismiss. Specifically, Santos contends that, "[b]y overruling the motion to

dismiss, the trial court effectively added punishment to Santos without Santos being convicted of an additional charge." (Brief of Appellant at 6).

{¶ 45} To the extent that this argument diverges from those presented in Santos's dismissal motion, it was forfeited. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15. Even had the argument been preserved for purposes of appeal, this Court has already determined that cumulative punishments for a firearm specification and its underlying offense do not violate an individual's constitutional double jeopardy rights. *State v. Reid*, 2d Dist. Montgomery No. 23409, 2010-Ohio-1686, ¶ 47-48.

{¶ 46} Santos's second assignment of error is overruled.

### IV.    Conclusion

{¶ 47} Having overruled Santos's two assignments of error, the judgment of the trial court is hereby affirmed.

. . . . . . . . . . . . .


TUCKER, P.J., concurs.

DONOVAN, J., concurs in judgment only.


Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Robert Alan Brenner
Hon. Mary Lynn Wiseman